Morning Council. First case of the morning is in re Estate of Mary Ellena appearing for the appellant is attorney James Brandenburg and for the appellee we have attorneys David Hennessey and attorney Booker and Mr. Hennessey you're arguing. Is that right? All right. Counselor, are you ready to proceed? I am. You must. Thank you. May it please the court. Counsel, I'm James Brandenburg. I represent the son and executor of the Estate of Mary Ellena. We're here asking the court today to reverse the trial court's order denying our motion for judgment notwithstanding the verdict and to remand this case back to the trial court on the issue of damages. The evidence in this case, the evidence of defendant's negligence in this case we believe is so overwhelming that the jury's, even when viewed in the light, most favorable to the defendant that the jury's verdict cannot stand. The evidence in this case established that Mary Ellena was placed in a nursing home in December of 2003 after she had fallen in a ditch in the front of her home in the short time between the time Mr. Ellena had left to go to work and a home health care provider had arrived home. During that time a care plan was implemented to address Mary's risk of falls and it was known by the nursing home that she was a fall risk. On February 1st, 2004, Mary Ellena suffered a fall at the nursing home in her room. At that time a plan was implemented to place Mary in a high traffic area when she was up out of bed in her wheelchair. The defendant's expert, Nurse Brown, conceded that this was part of the record and that this was a plan in place to address her fall risk. She also at trial stated that if a care plan is implemented it needs to be followed and if it's not followed it can have a detrimental effect on the well-being of the resident. Counsel, let me ask you, was it clear with respect to exactly, I know she was in her room when they found her when she fell the most recent time, but my question is do we know whether or not she was up, because I know the care plan involved having her in a possibly a high traffic area when she was up and about in terms of being up in her wheelchair, do we really know whether or not she was up at that time? I mean was she sitting up in her bed, was she sitting up in her wheelchair when she fell, do we know that? I believe we do, I think the evidence was very clear. The notes from that morning showed that at 9.45 she was gotten up out of bed. What did the notes say specifically? I don't want you to lose a lot of your time, let me ask you another question. There seemed to be some, I don't know, a mix up with the exhibits as far as what made it to us and what was at the trial court. If I'm recalling correctly, was it number 12 that contained all the notes from either the nursing home or the hospital? And it wasn't real clear whether or not all those notes actually were exhibits, because there were references in your brief and then going to that in the record it wasn't real clear as to whether or not those were notes from the hospital or notes from the nursing home. I believe we addressed that in our reply brief. The whole record from the facility was part of the defendant's exhibit and we, by stipulation, admitted the whole record from the facility into evidence. You indicated in your reply brief that the fall investigation tool was in group exhibit A and that that was in exhibit envelope number 2. Do you know whether or not that actually made it into the record on appeal? I believe it did because it was part of the record. To address your question too about whether she was in her wheelchair, after she had fallen she was taken to the hospital and she was seen by Dr. Mather who took a history and he testified that he takes a complete history, that his history was accurate and the history that he took was that she had fallen from her wheelchair that morning of April 15th. And I guess that's where I'm a little concerned because we don't have an eyewitness to her fall, correct? No one was identified as seeing her fall at that point, right? Right. And so we don't really know from whom the history came that the doctor noted. I believe that he said that it would most likely have come from someone from the nursing home because she suffered from dementia, she had some issues. I believe, and I don't want to state with certainty, but I believe that I asked him that question whether he believed that he took reliable history. I know that he testified that the history he took was an accurate history based upon what he was told. And you believe he identified someone specifically from the nursing home? No, he did not identify someone specifically, but he said most likely it would have come from someone from the nursing home. Our expert testified too that there was no note that she had been transferred back into her bed. So there's the note that she was at 945, skin was warm, dry, color fair, note indicates staff had transferred Mary from her bed to her wheelchair. And so what's the number on that note that's from the nursing home, I take it? Right, that's 977, 85. I'm sorry? Looks like volume 977, 85 is the reference on that. 77, 85? Yes. I don't think the record on appeal even goes that high. There's no question that her fall was the proximate cause of her hip fracture. Our expert, Dr. Holstein, testified that that was the cause. The defendants had no controlled expert. Dr. Mather testified that that was the cause. And then there's also no question that this led to her decline in health. She was bedridden, she was not a candidate for surgery following that, both Dr. Holstein and both Dr. Mather. So do you believe it really comes down to whether or not there was sufficient evidence basically for the jury to find that there was no breach of the standard of care? I'm sorry, can you repeat that? So do you believe that it comes down to whether or not there was sufficient evidence for the jury to find that there was not a breach of the standard of care? Correct. I think that the jury, even viewing the facts in the light most favorable to the defendant, there's no way the jury could have found that they followed the standard of care. Their own expert admitted that there was a care plan in place that she was to be in a high-traffic area. And I know there was some reference to 24-hour, one-on-one care and restraints. And everyone agreed that that was not part of the care plan and that that was not appropriate, so to speak. Correct. And I think the issue from their own protocol, she was to be in a high-traffic area when she was up and she was found on the floor in her room. And that's why I think this note that I've been asking you about is so important, because I know that, I believe that note said she had food in her mouth and that she, you know, they talked about her skin as far as touching her skin, and I can't remember if they said warm to the touch or what. But anyway, I'm just wondering, was it really established that she should have been out in a high-traffic area based on whether or not she was even out of bed at that point before she fell versus in a wheelchair? Right. Well, I think that there was no evidence put out by the defense that she was anywhere but in a wheelchair. I mean, we have Dr. Mather that testified he took a history that she had fallen from a wheelchair. We have the note which our expert testified about, and which I believe is part of the record, that she had food in her mouth, that she had been transferred at 945 from her wheelchair, or from her bed to her wheelchair. There's no further note that she was put back in bed. She had food in her mouth at the time she had fallen. The evidence was overwhelming that she was in her wheelchair. There was no evidence whatsoever that she was anywhere other than her wheelchair. I mean, of course, we didn't have an eyewitness to come in and say, you know, what she had fallen from. But, you know, I don't know, absent an eyewitness, you know, what else you can show. I mean, thinking of the IPI that says circumstantial evidence is just as, you know, relevant as direct evidence. I mean, if you don't have an eyewitness, I don't know how else, you know, you establish that. And I think we did all we could, and there was no evidence for the jury to consider other than the fact that we have Dr. Mather saying he took a history that she fell from her wheelchair, she had food in her mouth, there's the note saying she was transferred from her bed to her wheelchair, no indication that she was put back in bed. That's all the jury had to consider. Well, did Dr. Harris testify that the nurse's note was silent as to whether or not the decedent was in a wheelchair? The note did not say that she was in her wheelchair. It didn't say what she had fallen, it just said that, you know, the resident came to the resident's room and found on the floor, and I believe it said, Walker, you know, against the wall. But no, the nurse's note did not indicate from what she had fallen. You would acknowledge that the Pedrick standard applies in this situation, is that right? Yes. So, the evidence has to be viewed in the light most favorable to the defense, and it has to be so overwhelming in favor of the plaintiff that no contrary verdict could ever stand, that is the Pedrick standard, right? Correct. And you had an expert on standard of care, the defense had an expert on standard of care, there were competing opinions about what the standard of care required and whether there was a breach, is that right? I disagree with that, Your Honor. Okay, so can you explain that? Sure, their expert conceded that there was this April, February 1st, 2004 fall assessment tool that stated that when she was to be up, she was to be in a high traffic area, and I believe we quoted her cross-examination in our brief, where she said that if a plan is implemented, it needs to be followed, and in this case, there was a plan that if she was up in her wheelchair, she was to be in a high traffic area, and she conceded that she fell in her work. So I think that based upon their expert's own admission that they were to follow their own protocol, that this protocol, if it's not followed, can be a detriment to the well-being of the individual. Did your expert explain the proximate cause element? In other words, if she had been kept in a high traffic area, how that would have prevented the fall? Or did she affirmatively testify that this fall would not have occurred? I believe she testified that it's more likely than not that it would not have occurred. There was some testimony about the nurses, and I think this was more brought out with regard to the one-on-one care, but if you look at the facts, we have an 89-year-old woman, if she's in a high traffic area, there was testimony that it would be more likely than not that she would not have fallen, that somebody would have been able to see her if she was in a high traffic area. And that testimony came from whom? I believe that was from Dr. Karras. That would have been Dr. Karras, our expert. Thank you. If there's no further questions... I don't see any. Thank you. Thank you. Mr. Hennessey? Thank you, Your Honor. May it please the Court? Counselor? One of the things that stuck out to me there in that initial argument was that he said we did all we could. And that's exactly right. We don't have any issues here claimed in the evidence that came in for the jury, regarding the jury instructions, regarding anything else that took place. It's simply a claim that we think the jury got it wrong. And I'm glad you referenced the Pedrick Standard, because that's simply not why we're supposed to be here. And there were a couple of procedural issues we briefed that I want to save for later, because really this appeal turns on what was before the jury in this case. And we talked a little bit already about those competing experts, and they truly were competing. Dr. Karras, plaintiff's own expert, conceded, as discussed, no restraints were necessary, no need for 24-7 care, and importantly on the causation point, had to concede that even if this patient happened to have been in a high-traffic area, that doesn't mean anybody was looking at her. If she's at a nurse's station, that's high traffic. And unfortunately, nurses are busy people, particularly in a nursing home, and they could very well be in somebody else's room, caring to somebody else. So that's part of it. Do you agree that Dr. Karras testified that it was more likely than not that she fell and was not seen because she was not in a high-traffic area? Honestly, Your Honor, I'm not exactly sure if she testified in that manner. It would not surprise me if she had, but I'd have to pull the transcript to be sure. I don't believe that that was briefed before you. But what Dr. Brown, our expert, who is a highly distinguished nurse in the community, did talk about was that our client did nothing wrong. There was no abuse or neglect of this patient, that she agreed with Dr. Karras that there was no need for one-on-one care, and she also brought into doubt the significance of care plans. It's not clear, and it wasn't clear before the jury, that a care plan is the standard of care. That's not established. And that brings us to the facility records, because I like to think of this appeal as really a formula presented by the appellant. The appellant's formula here is that we have a standard of care established by a care plan, that the care plan required high-traffic areas, and that the evidence pointed to her not being in a high-traffic area when she fell. That's a pretty simple factual formula, but it actually falls apart if you look at the records. They weren't cited, which is one of those procedural issues we talked about. But in this mountain of medical records, we have, I believe it's two pages, but one page that's operative, the fall investigation tool from February 2004. And that fall investigation tool, it's the second page, it's the care management portion of the fall investigation tool. Very bottom right corner has other checked, and a handwritten note, keeper in high-traffic areas went up. Now if you look at the top of that page, it specifically references that the care plans are different documents. This is not the care plan. The care plan, it says this should be added to the care plan to assist the patient's needs, basically. So that takes you then to the care plans in this case. There's a couple of them that are referenced in the briefs. There is no care plan document that says high-traffic areas. The only place in this record where high-traffic areas appear is on that one page, that one fall tool, when she fell in February and was not hurt. Falls are very common. The experts explain that to the jury. Our expert even said it's impossible to prevent all falls in these facilities. It's unfortunately the nature of a nursing home. We've got an 89-year-old very ill woman. She's got dementia. She's got UTIs. She's got a history of strokes. She's got all sorts of problems. Well, they could be prevented if there were restraints, but there were no restraints ordered here. Is that right? And there was testimony, Your Honor, that restraints are illegal. The chemical restraints, so using drugs, is not even a legal thing to do. And both experts, both plaintiff's experts and defense experts, said it would be highly inappropriate to use physical restraints. Okay, but, I mean, just in terms of the evidence here, there was no order for bed rails to be raised. Is that right? I believe there were other precautions in place, such as lowering the bed. I do not have them memorized by heart for you today. And, in fact, our expert, after reviewing the record, said that we had done everything appropriately, that there was nothing that was done incorrectly. But turning back to that point about that formula I mentioned, the high-traffic areas, let's take arguendo that the standard of care is established by the care plan. Even if that were true, which was suggested by the plaintiff's expert, it still falls apart because the care plans themselves don't say high-traffic areas. It's a full investigation tool that was completed after a February fall that said, maybe we should keep her in high-traffic areas. What's the difference? I guess I'm not following you. If it supplements the care plan. Because it doesn't supplement the care plan, Your Honor. If you look at the document itself, as I mentioned, at the top of the page it says, this should be added to the care plan. Okay, so how is that not a supplement? Because there's no testimony that it was added to the care plan. And the care plans themselves, if you review them, if you look at the care plans in this case, what they did is in January they created a typewritten care plan, and there's a page for each issue for the patient. One of the pages is false, of course. And what they do is they review it regularly. If you look at the record, they cross out the date, they add the new date, and they add supplemental issues to add to the care plan, things to do for this patient. There was never an addition regarding high-traffic areas. Well, even if it didn't appear in a single document, if the plaintiff had an expert saying standard of care required the patient to be in a high-traffic area, isn't that sufficient just in terms of making it a jury issue? I think that would be true if that had been the testimony in this case. The testimony was that standard of care is established by the care plan and that there's a conflation between these documents and that the care plan had suggested high-traffic areas, which is not true. Actually, there was a suggestion in one of the records from the facility that mentioned high-traffic areas. Let me ask you this question. If there was a suggestion that a high-traffic area was important for her care and it didn't get transferred to the care plan, are we talking about negligence there? Well, absolutely not. This is just one element of the case. We've talked about some of the other issues. They didn't meet their burden as far as where she was. We don't know where she was. There is nothing in the record that there was no way to establish that. Okay, but put that aside. It seemed to me you're arguing, well, it was in this, it didn't get to this, so therefore it's not part of the standard of care. Well, that could be very negligent for the nursing home not to take it from here and put it into the care plan. You could argue that. That wasn't argued. And we also do have separate testimony. This is just an element of their argument on appeal. The testimony from our expert was that we acted appropriately, that there was no... Yeah, I understand that. You're saying the plaintiff's expert did not identify as a breach of the standard of care the omission that just both is talking about. Precisely. The standard of care was not established to require high traffic areas is the bottom line. That's the point that I'm making. And that's certainly in dispute, our expert suggested. The point of talking about constant care, one-on-one care, is because there are patients in these facilities that do get one-on-one care. That does happen. This patient didn't receive one-on-one care. And both experts agree that that wasn't necessary. And high traffic areas doesn't rise to the level of one-on-one care. Now, that was part of that discussion from the experts and what was presented to the jury in this case. So I just want to briefly then turn to those procedural issues I've mentioned. They're briefed before you. I don't think they're necessary once you look at the evidence. But the post-trial motion in this case, we argued, was insufficient to be granted relief. We cited the FET case, which explains when there's just conclusory statements in a post-trial motion, it doesn't cut it. And in the reply brief, the appellant has suggested to us that the FET case just included a brief motion that's different from the motion herein. But I would point your honors to the fact, in that case, there was a memorandum of law in support of that motion that failed. And I'll leave it at that. And then the second issue we have is the record citations, which we argued were insufficient in this case. And the law is clear. When you don't cite to the record, you waive the issue on appeal. I don't want to be hyper-technical before you, but all the citations in the brief in this case were to expert testimony. And the experts did discuss the records, but the records were never cited. And we had difficulty identifying those records in the record. But beyond that, if you don't have any further questions, that's all I have for you. Okay. Thank you. Thank you very much. Thank you, Mr. Hennessey. Mr. Brandsburg, we got a rebuttal? Yes, thank you. A couple things. Justice White, you had asked about whether or not our expert, Dr. Harris, had said it would be more likely than not that she would not have fallen. I don't want to mislead the court. I'm going from memory. I can't imagine that I would not have had her testify any other way, knowing that that's one of the elements that we would need to establish. But if you go back into the record and don't find it, I'm going from memory on that. As far as the fall assessment tool, that's found in Defendant's Group Exhibit A, and it's a CD. In Exhibit Envelope No. 2, that contains the whole record of Heritage Manors nursing home records that we put in by agreement of the parties. Now, there's been something made about whether or not this assessment after her February 1st fall that she'd be placed in a high-traffic area went up, whether or not that made it into the care plan. I don't think that, frankly, matters. I mean, their expert testified the question. And in this instance, an assessment was made that if Mary is out of bed and up in her wheelchair, she was to be placed in a high-traffic area. Correct? She answered yes. That was the standard. Whether it's what type of document they're putting this on, I don't think is the question. What it goes to is the notice that they have of a certain risk, a plan to address that risk. We know that they were aware of the risk. They developed a plan, whether it was put on a page called a care plan or whether it was put on this fall assessment tool, which, frankly, if it's on a fall assessment tool, I think that even shows that they have more knowledge than a care plan, because if you look at a care plan from facilities, it's 20 different areas, nutrition, this and that. It's just cut and paste, basically, general things you're going to do here with this fall assessment tool. They were responding to a specific incident where she had actually fallen, and they said, what can we do to prevent this in the future, place her in a high-traffic area? So I think to argue that because it wasn't in a care plan, frankly, just isn't logical. Well, did their expert say that, yes, it was in this assessment, and then take the next step and say that they would have been negligent if they didn't follow that? I didn't go that far with her. She said that if it's not followed, she testified, I asked her, you agreed when I took your deposition, if a care plan is implemented, it needs to be followed. Answered yes. And part of the problem, when I took her deposition, she could not identify a care plan within the records. And so I had moved for summary judgment based on that, which was denied. But once we got to trial, she had found this fall assessment tool. And so that was kind of a surprise to me, so I wasn't as prepared. But then I followed up. And if it is not followed, that can have a detrimental effect on the care that is provided to that individual. She answered yes. And in this instance, an assessment was made that if Mary is out of bed and up in her wheelchair, she was to be placed in a high-traffic area, correct? Yes. In this instance, we know she was found on the floor in her room, correct? Correct. I think that establishes that there was this care plan that if it's, while she didn't use the magic word standard of care requires, I think an inference can be drawn from that, that they were aware of this risk, that a plan was developed. If it's developed, it needs to be followed. And if it's not followed, it can have a detrimental effect. I mean, I think that without using the magic word standard of care is essentially standard of care. It's what a reasonable facility would do under the circumstances. So while she didn't use the magic word standard of care, I think we clearly established that that was the standard, and our expert testified that that was the standard. And I think where the jury possibly got hung up was with this talk of restraints, with this talk of 24-hour one-on-one care, that both experts agreed was not appropriate under the circumstances. But I think both experts agreed that there was a protocol implemented and that it, frankly, was not followed. Thank you. Okay. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision shall issue.